

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-21-00030-CV
_____

IN RE GILEAD SCIENCES, INC.

Original Mandamus Proceeding

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Stevens

# MEMORANDUM OPINION

Gilead Sciences, Inc.,[1] has filed a petition asking this Court to conditionally issue a writ of mandamus directing the Honorable Brad Morin, Judge of the 71st Judicial District Court of Harrison County, Texas, to stay proceedings under the Texas Medicaid Fraud Prevention Act's first-to-file bar and under general principles of comity. Because we find that comity requires a stay of proceedings, we conditionally grant mandamus relief.

## I.     Background

### A.     Health Choice Advocates Brings a *Qui Tam* Action Under the Texas Medicaid Fraud Prevention Act

This original proceeding involves the Texas Medicaid Fraud Prevention Act (TMFPA), which "is a powerful tool for targeting fraud against the Texas Medicaid program and securing the program's integrity." *In re Xerox Corp.*, 555 S.W.3d 518, 525 (Tex. 2018) (orig. proceeding). "In conjunction with the federal government, the Texas Medicaid program provides medical coverage to eligible Texans in need." *Id.* at 524. "As with all government-funded programs, Medicaid resources are limited, which means fraud, abuse, and waste divert funds that could otherwise be used to provide essential health-care services." *Id.* "But fiscal impact is not the only concern. When services are provided improperly or unnecessarily, Medicaid patients are imperiled." *Id.* "The Medicaid system's size and complexity, the limited time and financial resources of governmental regulators, and the increasing sophistication of Medicaid scams make chicanery difficult to uncover." *Id.* at 525. For this reason, "[t]he statute

---

[1]Gilead is a biopharmaceutical company headquartered in Foster City, California.

imbues the attorney general with broad investigative and enforcement authority and—via *qui tam*

provisions—deputizes private citizens to pursue a TMFPA action on the government's behalf."

*Id.* (citing TEX. HUM. RES. CODE ANN. §§ 36.051–.055, .101).

Here, Health Choice Advocates, LLC (HCA), filed a *qui tam* action on behalf of the State

of Texas against Gilead Sciences, Inc., in the 71st Judicial District Court of Harrison County

(HCA's suit). The *qui tam* provisions in the TMFPA provide for a private citizen to receive "a

share in the recovery and reasonable expenses, attorney's fees, and costs." *Id.* at 536 (citing

TEX. HUM. RES. CODE ANN. §§ 36.101, .104, .110). "The statutory bounty varies from ten

percent to thirty percent of the proceeds, depending on a variety of factors, including whether the

State exercises its right to take over the action." *Id.*

### B.      The TMFPA's First-to-File Bar

"A *qui tam* case is barred, however, if the action is based on allegations or transactions

already known to the government, except for actions brought by 'an original source of the

information.'"[2] *Id.*; *see U.S. ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 381

(5th Cir. 2009) ("[T]he public disclosure bar is based upon the notion that a *qui tam* suit does not

benefit the Government if the information about the fraud is already publicly known, unless the

plaintiff is an original source."). "To ferret out information about fraudulent activities, the

---

[2]As shown below, the trial court denied Gilead's plea to the jurisdiction based on the first-to-file bar. Gilead does not ask this Court to revisit the trial court's ruling on the plea to the jurisdiction and "[g]enerally, mandamus relief is not available to correct incidental trial court rulings where there is a remedy by appeal, including the granting or denial of a plea to the jurisdiction." *In re Volt Elec. Provider, LP*, No. 01-20-00665-CV, 2020 WL 6731661, at *1 (Tex. App.—Houston [1st Dist.] Nov. 17, 2020, orig. proceeding) (per curiam) (mem. op.) (citing *In re Entergy Corp.*, 142 S.W.3d 316, 320 (Tex. 2004) (orig. proceeding)). Rather, Gilead argues that the first-to-file bar should be applied when deciding whether to stay this case. Because we determine that comity requires a stay, we need not discuss the first-to-file bar in analyzing whether a stay should be granted. As a result, our discussion of the first-to-file bar is only provided as context for the parties' arguments.

TMFPA thus coaxes wrongdoers to divulge potentially incriminating information both through penalty avoidance and by allowing an 'original source' of information to pursue a TMFPA bounty to the exclusion of other potential relators." *Xerox Corp.*, 555 S.W.3d at 536–37 (quoting TEX. HUM. RES. CODE ANN. § 36.113(b)).

Also, Section 36.106 states, "A person other than the state may not intervene or bring a related action based on the facts underlying a pending action brought under this subchapter." TEX. HUM. RES. CODE ANN. § 36.106. This section is based on the federal False Claims Act's (FCA) provision, which states, "When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C.A. § 3730(b)(5). This section is often called the "first-to-file bar." *United States v. Planned Parenthood of Houston*, 570 F. App'x 386, 389 (5th Cir. 2014) (per curiam). Where an investigation into complaints filed in other states would uncover the wrongdoing at issue in the new action, the simple addition of special facts in a newly filed complaint "are not sufficient to make the alleged fraudulent activity sufficiently distinct to avoid the first-to-file bar." *Id.* at 389–90 (citing *U.S. ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 378 (5th Cir. 2009) (holding that the relator cannot avoid the first-to-file bar 'by simply adding factual details . . . to the essential or material elements of a fraud claim against the same defendant'")). If the newly filed complaint "alleges the same material or essential elements of fraud described in a pending qui tam action," the first-to-file bar applies. *U.S. ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 378 (5th Cir. 2009).

4

### C.        Gilead Moves to Dismiss HCA's Suit Under the First-to-File Bar

"In the Fifth Circuit, th[e] first-to-file rule is jurisdictional." *United States v. Albertsons LLC*, No. SA-15-CV-957-XR, 2018 WL 6609571, at *2 (W.D. Tex. Dec. 17, 2018) (order) (citing *United States ex rel. Edgett v. Kimberly-Clark Corp.*, No. 3:15-CV-0434-B, 2017 WL 4222697, at *3 (N.D. Tex. Sept. 22, 2017) (mem. op. & order) (citing *Branch*, 560 F.3d at 378). Arguing that HCA's suit was based on the facts underlying a pending action in Pennsylvania federal court, Gilead moved to dismiss HCA's suit. A careful examination of the complaints filed in each case is required to understand the parties' arguments.

### 1.        The Pennsylvania Action

On March 16, 2017, the United States and twenty-nine states, including Texas, through their *qui tam* relator, Toby Travis, sued Gilead, the company that owned the drugs Sovaldi and Harvoni, which treat hepatitis-C, in the Eastern District of Pennsylvania for violating the FCA and TMFPA. On April 17, 2018, a second amended complaint was filed that added Premier Pharmacy Services (Premier), Covance, and Healthstar CES as defendants. The second amended complaint, which we refer to as the Pennsylvania Action,[3] alleged that cooperation among the defendants resulted in claims for payment from Medicare and Medicaid that violated anti-kickback statutes because their conduct offered to or paid remuneration to induce the purchase of

---

[3]After the parties had fully briefed this case, HCA filed a letter with this Court attaching what purports to be a new amended petition filed with the Eastern District of Pennsylvania and a "'redline' comparison between the . . . Third Amended Complaint and the pleading that serves as the basis for the Petition [for writ of mandamus]." The letter argues that these newly available documents render Gilead's petition for a writ of mandamus moot. We may not consider the attachments because (1) they are not a part of the mandamus record or appendix, and (2) they are not certified or sworn as required by the Texas Rules of Appellate Procedure. *See* TEX. R. APP. P. 52.4, 52.3(j), 52.3(k); *In re Gilead Scis., Inc.*, No. 06-21-00027-CV, 2021 WL 1537482, at *1 (Tex. App.—Texarkana Apr. 20, 2021, orig. proceeding) (mem. op.).

a good, service, or item or "refer[red] an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." *See* 42 U.S.C.A. § 1320a-7b(b)(2)(A)–(B).

The Pennsylvania Action alleged that Premier was a specialty pharmacy that paid Gilead sales representatives in exchange for prescription referrals, that Healthstar provided clinical nurse educators to Gilead, who used them "to unlawfully induce physicians to prescribe Sovaldi and Harvoni," and that Covance provided "a variety of services" to Gilead. It specified that Gilead engaged in "prohibited marketing practices" to promote Sovaldi and Harvoni and referred to several alleged schemes on Gilead's part, including what we call the "nurse-educator scheme" and the "reimbursement-support-services scheme."

The Pennsylvania Action reported that, for "at least two months prior to the launch of Sovaldi, Gilead hired, trained and deployed to physician's offices, a team of nurse educators." The nurse educators, "who were hired through Healthstar," provided "educational resources as well as branded starter kits" and "valuable resource[s] to providers which w[ere] intended to induce Harvoni and Sovaldi prescriptions." Nurse educators provided "direct-to-patient education . . . in the beneficiary provider's office," including side effect management, administration of Sovaldi and Harvoni, and handling patient follow-up questions "to prevent the patients from bothering the physician's staff." The nurse-educator scheme excused providers from "expend[ing] their own resources to train and educate patients," and Gilead's sales force was trained to pitch nurse-educator services to providers to demonstrate cost and time savings to the provider. If a provider still wished for their own staff to provide these services, Gilead would

6

train the staff member "to provide hepatitis-C and Sovaldi or Harvoni education to the provider's patients," if the provider prescribed these drugs.

The Pennsylvania Action alleged, "The fact that Gilead even had nurse educators for Sovaldi and Harvoni demonstrates that its true intent in providing these services was to induce prescriptions, and not to educate patients. . . . Rather, the nurse educator services were in-kind remuneration intended to induce prescriptions of Sovaldi and Harvoni" because they "were only provided if the physician prescribed Sovaldi or Harvoni." It continued,

> Gilead provided patient education to providers as an inducement to prescribe Sovaldi or Harvoni over other drugs. By doing this, Gilead allowed providers to receive the full [evaluation and management] payment for their patients with [hepatitis-C virus], a chronic condition, despite the fact that Gilead was actually performing some of the services incorporated into the [evaluation and management] payment. This, in addition to the value these services provided to providers, results in a violation of [anti-kickback statutes].

Next, we address the reimbursement-support-services scheme. Reimbursement support services included "a provider's administrative tasks associated with prescribing a patient medication, such as coverage determinations, benefit verifications, prior authorizations, and coverage appeals" and constituted a valuable benefit to "[p]hysician practices[, which] spend a significant amount of time handling these administrative responsibilities associated with prescribing patients medication." The Pennsylvania Action alleged (1) that "[e]nsuring that insurance providers covered prescriptions for Sovaldi and Harvoni was a top priority of Gilead," (2) that the costs of these medications were extremely high and, as a result, required more complex support services, and (3) that "[t]o address this issue . . . Gilead created its Support Path

7

program," which was "designed to assist providers, mainly with coverage issues, in connection with prescribing their patients . . . Sovaldi or Harvoni."

The Pennsylvania Action explained that, before the launch of Sovaldi into the market, Gilead sales representatives were instructed to establish a relationship with a specialty pharmacy, like Premier, for directing providers to send Sovaldi and Harvoni prescriptions to them "to give them more control over coverage issues such as prior authorizations." Travis, a former Gilead employee, alleged that "representatives from the specialty pharmacy and Gilead sales representatives would make joint sales calls to physicians' offices so they could explain that the specialty pharmacy would handle all of the administrative responsibilities associated with prescribing the drug" and that Premier, who provided reimbursement support services, "would regularly send a representative with [Travis] on sales calls to physicians' offices." Specialty pharmacies were selected by Gilead based on whether they would perform reimbursement support services for Sovaldi prescriptions on behalf of providers. The Pennsylvania Action alleged that this conduct violated anti-kickback statutes because specialty pharmacies paid in-kind remuneration to Gilead by performing the administrative responsibilities associated with obtaining coverage of Sovaldi and Harvoni in exchange for prescription referrals. The Pennsylvania Action also alleged that "providers exhaust significant resources performing [reimbursement-support-services] functions, and removing this burden is a significant value to providers and offers them a substantial incentive to refer all of their prescriptions for [hepatitis-C virus] medications to a specialty pharmacy who will perform the [reimbursement support services] for them." Thus, the Pennsylvania Action alleged that reimbursement support services,

which "provid[ed] value to the providers," was an "in-kind remuneration and violate[d] the [anti-kickback statute.]"

Along with alleging violations of the FCA, the Pennsylvania Action alleged these violations of the TMFPA:

> . . . . Defendants violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

> . . . . The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

> . . . . Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Texas in connection with Defendants' conduct. Compliance with applicable Texas statutes was also a condition of payment of claims submitted to the State of Texas.

> . . . . Had the State of Texas known Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

> . . . . As a result of Defendants' violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

> . . . .

> . . . . Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of himself and the State of Texas.

9

. . . . This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

It is undisputed that the Pennsylvania Action is currently pending.[4]

### 2.    HCA's Suit

Even though the Pennsylvania Action had not been resolved, HCA filed its suit on May 8, 2020.[5]   HCA's suit, filed only against Gilead, alleged that it "fraudulently engaged in unlawful marketing schemes and illegally reaped millions of dollars from Texas Medicaid" "with substantial assistance from third parties, including" Healthstar and Covance.  HCA's suit was based on "two unlawful marketing schemes involving at least four drugs," including Sovaldi and Harvoni and two drugs approved for HIV treatment called Truvada and Atripla (collectively

---

[4]It is also undisputed that the original complaint filed in the Eastern District of Pennsylvania involved the same schemes alleged in HCA's suit.  The original complaint stated, in relevant part,

- "Gilead provided free RSS to prescribing providers through its Support Path program.  According to Relator, after a physician decided to prescribe his/her patient to Sovaldi or Harvoni, they could sign up for Support Path by submitting a Gilead provided form . . . .  After this form was submitted, Support Path would provide free RSS in connection with Gilead prescriptions, thereby relieving the provider from having to perform all of the administrative responsibilities associated with RSS."
- "Support Path assumed the entire burden of performing RSS from prescribing physicians, and handled nearly every aspect of obtaining patient coverage of Sovaldi or Harvoni.  For example, for prior authorizations, Support Path would fill out and submit all the relevant documents to the government healthcare program on behalf of the patient.  Support Path would further serve as a line of communication between the insurance provider and the physician practice should they require any additional information to make their determination."
- "According to Relator, one of the primary purposes of the nurse educators was to gain access to providers who typically would not allow sales calls from sales representatives.  As clinicians, nurse educators are viewed as peers, and therefore have much greater success in accessing practices than sales representatives.  For example, nurse educators had their own provider target list, but would coordinate with the sales representative in their territory to determine what offices they were having trouble gaining access to."

[5]HCA had filed two *qui tam* actions against Gilead in the United States District Court for the Eastern District of Texas, Texarkana Division, but those cases are no longer pending.

referred to as Covered Drugs). HCA alleged that, despite anti-kickback statutes, Gilead "nonetheless designed and executed the two schemes to use kickbacks to boost prescriptions and increase profits in violation of Texas law," causing "Texas Medicaid to pay millions of dollars in improper reimbursements in violation of Texas law."

Under a heading labeled "The Specific Conduct," HCA's suit alleged:

> . . . . First, Gilead contracted with and paid remuneration to Healthstar to deploy nurses to recommend Sovaldi and Harvoni to Prescribers and patients. While purporting to provide independent medical advice and disease-awareness information, the Healthstar nurses were in reality acting as undercover sales representatives for Gilead, focused on the singular mission Gilead had paid them to accomplish: refer Sovaldi and Harvoni to Prescribers and patients.

> . . . . Second, with assistance from Covance, Gilead provided in-kind remuneration to Prescribers in the form of reimbursement support services, saving Prescribers thousands of dollars in administrative expenses. These reimbursement support services were provided in part to induce Prescribers to prescribe the Covered Drugs to their patients.

HCA's suit labeled Gilead's nurse-educator conduct with Healthstar as a "white coat marketing campaign"[6] and its conduct with Covance as "reimbursement support services"[7] and alleged they

---

[6]HCA described the white-coat marketing campaign as follows:

- "Beginning in 2013, Gilead contracted with Healthstar to employ nurses to help promote Sovaldi and obtain easier access to Prescribers who oftentimes are skeptical of sales reps and, as a consequence, restrict or deny access to such reps. Once Harvoni was launched in 2014, Healthstar nurses also began to promote Harvoni."
- "Gilead contracted with Healthstar and hired roughly two dozen nurses to help Gilead gain direct, unfettered access to Prescribers and patients. Gilead's purpose was quite simple: it wished to cloak itself in the uniforms of the Healthstar nurses and push Prescribers to prescribe and patients to request prescriptions for Sovaldi and Harvoni."
- "Gilead's relationship with Healthstar plainly involves the payment of a kickback – cash consideration –in return for services that led to prescriptions being filled and paid for with Texas Medicaid and government money. By paying remuneration to recommend products that were subsequently reimbursed by government programs, Gilead violated Texas law."

11

were both implemented "with the goal of defrauding Medicaid by causing the submission of claims for the Covered Drugs that were knowingly and intentionally induced by unlawful remuneration."

As did the Pennsylvania Action, HCA's suit sought recovery under Section 36.002 of the TMFPA. Instead of the general language in the Pennsylvania Action seeking recovery because "none of the claims submitted in connection with [Defendants'] conduct were even eligible for reimbursement" since "[c]ompliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws . . . was a condition of payment of claims

---

- "By paying healthcare professionals to influence their peers, Gilead improperly influenced the Prescribers' behavior, causing them to write prescriptions that were reimbursed by state and Government insurance programs, including the state of Texas."
- "The Office of Inspector General ("OIG") refers to utilizing healthcare providers, like nurses, to promote particular drugs as 'white coat marketing,' and has warned against the practice."
- "Each of the nurses underwent a rigorous training program and learned sales techniques, similar to the program each Gilead drug rep undergoes. The sales training of the white coat marketing nurses was a key component of the scheme because Gilead's ultimate goal was to drive sales."
- "The nurses were trained over a period of multiple weeks. The training consisted of home-study, followed by training at Gilead headquarters in California, which also included Healthstar trainers. The nurses were taught skills needed to effectively 'detail' Sovaldi and Harvoni – that is, market them to Prescribers in the same manner as a sales rep would."
- "After gaining access to Prescribers, the white coat marketing nurses exclusively recommended Gilead's drugs."
- "Even more disturbing is the fact that the Healthstar nurses promoted Sovaldi and Harvoni directly to patients. Healthstar nurses gained direct access to individuals suffering from Hep-C, which placed them in a prime position to recommend and promote Gilead's products directly to these patients."

[7]As for reimbursement support services, HCA wrote,

To induce recommendations of the Covered Drugs over competing drugs, Gilead sales reps offered a second type of unlawful inducement: free reimbursement support services for Prescribers who wrote prescriptions for the Gilead Covered Drugs. This remuneration was a tangible, in-kind benefit that greatly reduced, and in some instances eliminated, Prescribers' administrative costs related to prescribing Gilead's Covered Drugs. Gilead referred to this remuneration as coverage determination and/or reimbursement support services, but in practice, the services were intended to induce Prescribers to choose Gilead's Covered Drugs over a competitor's drugs. For Sovaldi and Harvoni, the services were offered under a branded program called "Support Path." . . . . For certain prescription drugs that are particularly expensive, like the Covered Drugs, a Prescriber's staff must also work with the patient's insurance carrier to obtain what is known as a "prior authorization."

12

submitted to the State of [Texas]," HCA's suit further specified that recovery was sought because

> (i)     Gilead knowingly induced doctors to prescribe and/or continue to prescribe its products in violation of Texas law.  Tex. Hum. Res. Code § 32.039b(b)(l-d).  Gilead did so to receive benefits or payments under the Texas Medicaid program, which payment was made in whole or in part by Texas Medicaid.  In doing so, it violated Tex. Hum. Res. Code § 32.039b(b)(l-d).

> (ii)    In addition to an amount paid under the Medicaid program, Gilead knowingly paid, charged, or solicited a gift, money, donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product that is paid for, in whole or in part, under Texas Medicaid.  In doing so, Gilead violated TMFPA Tex. Hum. Res. Code § 36.002(5).

### C.     Gilead's Motion to Stay HCA's Suit Is Overruled

Gilead moved to stay HCA's suit pending the trial court's ruling on the plea to the jurisdiction.  Alternatively, if it declined to dismiss the case under the first-to-file bar, Gilead also requested the trial court to stay HCA's suit until the resolution of the Pennsylvania Action under general principles of comity.  On February 26, 2021, the trial court denied Gilead's plea to the jurisdiction.  Even so, it granted Gilead's motion to stay HCA's suit on April 1, but soon granted HCA's motion for reconsideration and lifted the stay on April 5.  In its petition for a writ of mandamus, Gilead requests that this Court compel Respondent to reinstate a stay of HCA's suit pending the resolution of the Pennsylvania Action.

## II.     Standard of Review

"Mandamus issues only when the mandamus record establishes (1) a clear abuse of discretion or violation of a duty imposed by law and (2) the absence of a clear and adequate remedy at law." *In re Good Shepherd Hosp., Inc.*, 572 S.W.3d 315, 319 (Tex. App.—Texarkana

13

2019, orig. proceeding) (citing *Cantu v. Longoria*, 878 S.W.2d 131 (Tex. 1994) (per curiam) (orig. proceeding); *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding)). "Mandamus is an extraordinary remedy that will issue only to correct a clear abuse of discretion, or in the absence of another statutory remedy, when the trial court fails to observe a mandatory statutory provision conferring a right or forbidding a particular action." *Id.* (citing *Abor v. Black*, 695 S.W.2d 564, 567 (Tex. 1985) (orig. proceeding), *abrogated on other grounds by In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004) (orig. proceeding)). Because there is no adequate remedy at law when a trial court fails to stay a case when comity demands it, mandamus review is appropriate. *In re Vinyl Techs., Inc.*, 352 S.W.3d 810, 813 (Tex. App.—San Antonio 2011, orig. proceeding); *In re BP Oil Supply Co.*, 317 S.W.3d 915, 923 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding).

"A trial court clearly abuses its discretion if 'it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.'" *Good Shepherd Hosp.*, 572 S.W.3d at 319 (quoting *Walker*, 827 S.W.2d at 839). "With respect to the resolution of factual issues or matters committed to the trial court's discretion, the reviewing court may not substitute its judgment for the trial court." *Id.* (citing *Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 714 (Tex. 1990) (orig. proceeding)). Even so, "[a] trial court has no 'discretion' in determining what the law is or applying the law to the facts." *Id.* (quoting *Huie v. DeShazo*, 922 S.W.2d 920, 927 (Tex. 1996) (orig. proceeding)). Thus, an erroneous legal conclusion or failure to apply the law correctly constitutes an abuse of discretion. *Id.* (citing *Huie*, 922 S.W.2d at 927–28; *Walker*, 827 S.W.2d at 840).

14

### III. Comity Requires a Stay of Proceedings

"Our federal system benefits from a measure of state-to-state comity, which, while not a constitutional obligation, is a 'principle of mutual convenience whereby one state or jurisdiction will give effect to the laws and judicial decisions of another.'" *BP Oil Supply Co.*, 317 S.W.3d at 918–21 (quoting *In re AutoNation, Inc.*, 228 S.W.3d 663, 670 (Tex. 2007) (orig. proceeding) (quoting *Gannon v. Payne*, 706 S.W.2d 304, 306 (Tex. 1986)).

"The mere pendency of a prior suit in one state cannot be pleaded in abatement or in bar to a subsequent suit in Texas, even though both suits are between the same parties and involve the same subject matter." *Id.* (citing *In re State Farm Mut. Auto. Ins. Co.*, 192 S.W.3d 897, 900 (Tex. App.—Tyler 2006, orig. proceeding)). This is because "Texas is entirely sovereign and unrestricted in its powers, whether legislative, judicial, or executive, and it does not acknowledge the right of any other state to hinder its own sovereign acts or proceedings." *Id.* at 919 (citing *State Farm*, 192 S.W.3d at 901). That said, "[w]hen a matter is first filed in another state, the general rule is that Texas courts stay the later-filed proceeding pending adjudication of the first suit." *Id.* (citing *AutoNation, Inc.*, 228 S.W.3d at 670).

"It is generally appropriate for courts to apply principles of comity where another court has exercised jurisdiction over the matter and where the states agree about the public policy at issue." *Id.* (citing *State Farm*, 192 S.W.3d at 901 (citing *Bryant v. United Shortline Inc. Assurance Servs., N.A.*, 972 S.W.2d 26, 31 (Tex. 1998))). "Once stayed, the later action remains pending until the judgment in the prior action becomes final." *Id.* (citing *State Farm*, 192 S.W.3d at 901; *Bryant*, 972 S.W.2d at 31).

15

"We must closely inspect the two pending actions in order to determine whether the trial court abused its discretion in failing to stay the Texas proceeding based on comity." *Vinyl Techs.*, 352 S.W.3d at 814 (citing *State Farm*, 192 S.W.3d at 901 (citing *Nowell v. Nowell*, 408 S.W.2d 550, 553 (Tex. App.—Dallas 1966, writ dism'd)). It is not required that the two suits be identical to obtain a stay of a subsequent suit. *See In re Cooper Indus., LLC*, No. 14-13-00500-CV, 2013 WL 3893984, at *1 (Tex. App.—Houston [14th Dist.] July 25, 2013, orig. proceeding) (per curiam) (mem. op.) ("The principle of comity generally requires the abatement of the later-filed suit of two similar suits pending in different states."). "[I]t is generally necessary that the two suits: (1) involve the same cause of action; (2) concern the same subject matter; (3) involve the same issues; and (4) seek the same relief." *Vinyl Techs.*, 352 S.W.3d at 814 (citing *State Farm*, 192 S.W.3d at 901). "Additional factors that can be considered are: (1) which action was filed first; (2) whether the parties are the same in both actions; and (3) the effect of a judgment in the later action on any order or judgment entered in the prior action." *Id.* (citing *State Farm*, 192 S.W.3d at 901).

It is undisputed that the alleged schemes forming the basis of HCA's suit were included in the first complaint filed on behalf of the State of Texas in the Eastern District of Pennsylvania. Still, HCA argues that its suit is different because the language HCA used in its suit to describe the alleged schemes was removed in the amended complaint filed in Pennsylvania. HCA contends that the Pennsylvania Action did not describe the nurse educators as promoters for Sovaldi and Harvoni *before* any prescriptions were written, but only that they acted as a post-prescription resource for providers. HCA also argues that the Pennsylvania Action did not allege

16

that Gilead itself used support services to incentivize providers to write prescriptions for Solvaldi and Harvoni, but instead alleged that specialty pharmacies provided the services. As a result, HCA believes its reimbursement-support-services scheme is materially different because Gilead was receiving kickbacks from specialty pharmacies in the Pennsylvania Action, whereas HCA's suit alleged that Gilead was offering support services to providers who were receiving the kickbacks.

Despite HCA's characterization of its suit, we see no material distinction between the schemes alleged in its suit versus the Pennsylvania Action. Both suits alleged that Gilead hired nurse educators through Healthstar to provide services to providers in violation of anti-kickback statutes. The Pennsylvania Action specified that, even before Sovaldi was launched, the nurses were trained by Gilead and deployed to physicians' offices while armed with educational resources and branded starter kits to unlawfully induce physicians to prescribe Sovaldi and Harvoni. The Pennsylvania Action alleged that the many services provided by the nurses after the prescriptions were written were marketed as cost- and time-saving measure to induce the provider to prescribe Sovaldi and Havoni. As a result, we find that the Pennsylvania Action also fairly described the Gilead-trained nurse educators as promotors for Sovaldi and Harvoni before prescriptions were written.

HCA's suit alleged that, with assistance from Covance, Gilead provided in-kind remuneration to providers in the form of reimbursement support services to induce them to prescribe the Covered Drugs. The Pennsylvania Action, which listed Covance, Premier, and many other pharmacies as defendants, described the same scheme. Both the Pennsylvania

17

Action and HCA's suit alleged that the same reimbursement support services were provided to prescribers and that the services were marketed to providers to induce prescriptions. Even though it alleged that Gilead received a kickback from Premier, the Pennsylvania Action also described why the providers received unlawful remuneration due to receipt of free reimbursement support services. Although it used Premier as an example, the Pennsylvania Action alleged that Covance provided services to Gilead and the actions of all Defendants, including Covance, resulted in false claims and violated the TMFPA.

As a result, we find that the Pennsylvania Action and HCA's suit concerned the same subject matter and involved the same issues. Both suits included causes of action under the TMFPA, alleged that Gilead's conduct resulted in submission of false claims paid by the State of Texas, and sought relief under Section 36.002 of the Texas Human Resources Code, namely recovery of damages from false claims submitted to the State of Texas and statutory recovery to the Relator. We find that the Pennsylvania Action and HCA's suit involved the same cause of action and, under the unique circumstances of this case, sought the same relief. While it is true that HCA's suit added two other drugs to its reimbursement-support-services allegations, we do not find that this impacts our analysis in this case. *See United States ex rel. LaFauci v. AbbVie Inc.*, No. 2:15-CV-7931, 2019 WL 1450791, at *4 (D.N.J. Apr. 2, 2019).

As for additional factors, the Pennsylvania Action was the first filed action and included the State of Texas, Gilead, Healthstar, and Covance as parties. Under the TMFPA, a judgment entered in HCA's favor would necessarily impact recovery available in the Pennsylvania Action and would conflict with TMFPA's policy on *qui tam* recovery.

18

For these reasons, we conclude that comity requires a stay of HCA's suit pending the conclusion of the Pennsylvania Action and that Gilead does not have an adequate remedy by appeal.

## IV.   Conclusion

We conditionally grant Gilead's petition for a writ of mandamus.  As a result, we order the trial court (1) to withdraw the April 5 order denying Gilead's motion for a stay of proceedings and (2) to enter an order granting Gilead's motion to stay proceedings until entry of final judgment in the Pennsylvania Action.  The writ will issue only if the trial court fails to act in accordance with this opinion.


Scott E. Stevens
Justice


Date Submitted:     September 29, 2021
Date Decided:        September 30, 2021

19